Judgment rendered October 2, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 55,817-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                           Appellee

versus

TREYDARRIUS WRIGHT                           Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 386,656

Honorable John D. Mosely, Jr., Judge

* * * * *

LOUISIANA APPELLATE PROJECT          Counsel for Appellant
By: Edward Kelly Bauman

JAMES E. STEWART, SR.                 Counsel for Appellee
District Attorney

ALEX L. PORUBSKY
CHEYENNE YVETTE WILSON
COURTNEY RAY
Assistant District Attorneys

* * * * *

Before STONE, ROBINSON, and HUNTER, JJ.

**HUNTER, J.**

Defendant, Treydarrius Wright, was charged by amended bill of information with second degree rape, in violation of La. R.S. 14:42.1(A)(2). Following a trial, a unanimous jury found defendant guilty as charged. He was sentenced to serve 35 years at hard labor without the benefit of parole, probation, or suspension of sentence. For the following reasons, we affirm.

**FACTS**

On July 30, 2021, 20-year-old M.G.[1] was shopping at a mall in Bossier City, Louisiana when she encountered defendant, Treydarrius Wright. Defendant approached M.G., called her by her first name, and claimed he knew her "from school." Although M.G. did not recognize defendant, she engaged in a conversation with him. Defendant told M.G. his name was "Jay," he was 22 years old, and he was originally from the State of California.[2] Defendant and M.G. exchanged telephone numbers and traded messages throughout the day; they made plans to meet later in the day.

Defendant picked M.G. up from her apartment at approximately 5:00 p.m. They first went to Party Central Family Fun Center in Bossier, where they ate and played games. They later attended a party at a biker club. While at the party, defendant accused M.G. of acting standoffish and "too boujee" because she preferred to sit alone. M.G. indicated she was ready to leave. However, during the ride home, M.G. changed her mind and agreed

---

[1] Since M.G. was the victim of a sex crime, she and her family members will be referred to by their initials. *See*, La. R.S. 46:1844(W).

[2] Defendant's actual nickname is "Trey," he was 25 years old, and he is not from California.

to accompany defendant to a liquor store in Shreveport where he purchased a bottle of Patrón (tequila).

After leaving the store, defendant drove M.G. to the home of his half-brother, Shamareio Bryant. When they arrived, M.G. discovered she was acquainted with Bryant because they had attended middle school together and had dated in the past.[3] Shortly after arriving at Bryant's home, defendant entered the bathroom, and witnesses testified they could hear "tapping" or "banging" noises coming from the bathroom. One of the guests, Jakhair Perrow, went to investigate the noise, and he observed defendant using a hammer to crush a "large pill." When defendant emerged from the bathroom, he began pouring shots of tequila for everyone at the house.

M.G. testified when defendant gave her the shot, "something told" her to refuse the drink, and she attempted to pour it out. However, defendant saw her trying to pour out the drink and accused her of "trying to fake out." Upon defendant's insistence, M.G. drank the shot of tequila. M.G. testified she immediately began to experience dizziness and light-headedness, "like the world started spinning." She also stated she became nauseous and "felt really weak." M.G. testified she drinks alcohol occasionally, and she had never experienced such a reaction after consuming alcohol.

Thereafter, defendant and M.G., accompanied by Bryant, returned to the biker club. By the time they arrived at the club, M.G. had difficulty walking unassisted and stated she did not "feel right." M.G. was unable to

---

[3] Present at Bryant's house were Bryant, Jakhair Perrow, Tyler Stewart, and two women identified only by their first names, DeErica and Keria.

recall anything after arriving at the biker club. She stated, "I just remember us walking up [to the biker club], and I don't remember much after that. *** I just remember waking up the next morning."

M.G. shared an apartment with her younger sister, MG-2. MG-2 testified defendant and M.G. arrived at the apartment between 12:00 a.m. and 1:00 a.m. on July 31, 2021. MG-2 also testified defendant told her his name was "Jay," and he was carrying M.G. over his shoulder. MG-2 described M.G.'s condition as "limp," "unresponsive, and "blacked out," and she stated defendant "started panicking" when she inquired about her sister's condition. According to MG-2, defendant told her he believed "somebody laced" M.G.'s drink. Defendant then ran down the stairs and left. MG-2 was unable to awaken M.G., so called her mother via Face-Time.[4]

When M.G. awakened the following day, she texted defendant and asked what happened the previous night. Defendant responded by telling M.G. she had gotten "really drunk," and he had taken her home. M.G. testified seconds after she received the text message from defendant, she received a telephone call from Bryant, who informed her he had received a text message from defendant. Bryant sent a screenshot of defendant's text message to M.G., which provided as follows:

> I'm going to call you. You need to say you went to Party
> Central with a girl. You had my truck and had sex in the

---

[4] C.B., M.G.'s mother, also testified. She stated she was at the apartment before M.G. left for her date with M.G., and M.G. was behaving normally. Later that night, one of her daughters called her via FaceTime, and she could see M.G. "was not responsive" and was "just limp." C.B. testified she instructed her daughter to call 9-1-1.

[console], and be like you had my truck, and I was ducked off at your crib.[5]

After receiving the text message from Bryant, M.G. suspected defendant had engaged in sexual intercourse with her while she was unresponsive. M.G. testified she reached out to defendant, accused him of lying to her and asked him if he had raped her or "did something without my consent." Defendant denied doing so.

M.G. presented to Ochsner-LSU Health Medical Center in Shreveport, where the hospital personnel notified the Shreveport Police Department ("SPD"). M.G. was examined by a sexual assault nurse examiner ("SANE"), who collected biological evidence using a physical evidence recovery kit ("PERK"). The nurse obtained swab samples from M.G.'s external genitalia, vaginal, perineal, anal and cervical areas. Subsequent testing for deoxyribonucleic acid ("DNA") revealed the semen extracted during M.G.'s sexual assault examination matched defendant's DNA. The nurse also drew blood for toxicology testing which later revealed M.G. had Clonazolam, a benzodiazepine, and carboxy tetrahydrocannabinol, a metabolite of THC (the active component of marijuana), in her system.

M.G. was also interviewed by police officers, and she identified defendant as the person she believed had sexually assaulted her. M.G. was provided a photographic lineup; she selected defendant from the array of photographs as the person she had met and gone out with on July 30, 2021.

Months later, defendant was interviewed by officers from the SPD. After being informed of his *Miranda* rights, defendant signed a waiver of

---

[5] M.G. later provided the screenshot of the text message to the Shreveport Police Department.

4

rights form.  Defendant admitted he met M.G. at the mall, picked her up from her home, took her to his half-brother's house, and poured tequila shots for those gathered at the house.  Defendant also stated M.G. consumed only one shot of tequila.  He denied crushing any pills at Bryant's house, putting drugs in M.G.'s drink, and engaging in sexual intercourse with her.  Defendant claimed he sent the text message to Bryant because he was married, and his wife had found a box of condoms in his truck.[6]

Defendant was arrested and initially charged with mingling harmful substances, in violation of La. R.S. 14:38.1.  The bill of information was later amended to charge defendant with mingling harmful substances and second degree rape, a violation of La. R.S. 14:42.1(A)(2).  Thereafter, the bill was amended again to charge defendant with second degree rape.

After hearing the testimony and reviewing the evidence, a unanimous jury found defendant guilty as charged.   The trial court denied defendant's motions for post-verdict judgment of acquittal and new trial.  He was sentenced to serve 35 years at hard labor without the benefit of parole, probation, or suspension of sentence.  The trial court also ordered defendant to register as a sex offender within 10 days of his release from prison.  Defense counsel filed a motion to reconsider sentence but did not state any specific reasons for the motion.  The trial court denied the motion to reconsider sentence.

Defendant appeals.

---

[6] Defendant's interview with police officers was videotaped.  The video recording was played for the jury during the trial.

DISCUSSION

Defendant contends the evidence was insufficient to support his conviction for second degree rape. He argues none of the witnesses saw him place any narcotic, anesthetic agent, or controlled dangerous substance in M.G.'s shot of tequila. He also maintains M.G. was unable to recall anything that happened after she left the biker club; therefore, according to defendant, it is possible M.G. voluntarily consumed drugs that night but does not recall doing so. Defendant also argues M.G. may have also consented to engaging in sexual intercourse with him, but due to consuming drugs, she is unable to recall the act. Therefore, defendant argues his conviction should be reversed.

In assessing the sufficiency of the evidence, a reviewing court must consider whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Leger*, 17-2084 (La. 6/26/19), 284 So. 3d 609; *State v. Frost*, 53,312 (La. App. 2 Cir. 3/4/20), 293 So. 3d 708, *writ denied*, 20-00628 (La. 11/18/20), 304 So. 3d 416. The *Jackson* standard does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517.

The appellate court does not assess the credibility of witnesses or reweigh evidence, and accords great deference to the trier of fact's decision to accept or reject witness testimony in whole or in part. *State v. McFarlin*, 54,754 (La. App. 2 Cir. 1/25/23), 354 So. 3d 888, *writ denied*, 23-00261 (La.

10/17/23), 371 So. 3d 1078; *State v. Frost, supra*. Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the issue is the weight of the evidence, not its sufficiency. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *State v. McFarlin, supra*; *State v. Gullette*, 43,032 (La. App. 2 Cir. 2/13/08), 975 So. 2d 753. This principle is equally applicable to victims of sexual assault; such testimony alone is sufficient even when the state offers no medical, scientific or physical evidence to prove the commission of the offense by the defendant. *State v. McFarlin, supra*; *State ex rel. P.R.R., Jr.*, 45,405 (La. App. 2 Cir. 5/19/10), 36 So. 3d 1138.

Second degree rape occurs when the oral or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed when the victim is incapable of resisting or of understanding the nature of the act by reason of stupor or abnormal condition of the mind produced by a narcotic or anesthetic agent or other controlled dangerous substance administered by the offender and without the knowledge of the victim. La. R.S. 14:42.1(A)(2).

During the trial, M.G. testified as to the events of July 30-31, 2021. She stated she had never heard of Clonazolam, she did not knowingly consume the drug, and she did not agree to take any substances on July 30, 2021. She also stated she was not aware anything other than Patrón was in the shot she drank, and she did not consent to be given anything other than a shot of Patrón. Further, M.G. testified she did not consent to engaging in

7

sexual intercourse with defendant. She also stated she did not knowingly take any prescription medications or consume any recreational drugs in July 2021. She testified when she drank the shot of Patrón defendant handed to her, she believed it contained only tequila.

Shamareio Bryant testified defendant called him on the night of the incident and told him he was bringing a woman to his house. According to Bryant, when defendant and M.G. arrived at his house, he saw defendant go into the bathroom. Shortly thereafter, Bryant heard a tapping noise coming from the bathroom, and his cousin, Jakhair Perrow, told him he saw defendant in the bathroom crushing a large pill with a hammer. When he emerged from the bathroom, defendant poured everyone a shot of tequila. Bryant stated he and Perrow did not drink the shot.

Bryant also testified as to their excursion to the biker club. He stated although it was cold inside the club, M.G. was sweating and appeared to be experiencing memory loss. Bryant testified he told defendant he needed to take M.G. home. He stated when they left the club, defendant became angry because M.G. kept calling Bryant's name and asking Bryant to help her. Bryant also testified defendant dropped him off at home, and when they arrived at his house, defendant shoved him and asked, "How am I going to f**k her now? The only thing she know[s] is Shamareio." Bryant also stated defendant left with M.G. in his vehicle, and told him he would be back in 30 minutes; however, defendant did not return until "two or three hours" later. Bryant stated the following morning, he received text messages from defendant, defendant's wife, and M.G.'s sister. He acknowledged the text

8

message defendant sent him instructing him (Bryant) to lie for him (defendant).

Jakhair Perrow testified he was at Bryant's home on July 30, 2021. He stated defendant entered the house, greeted Bryant, and went into the bathroom. Perrow also testified he heard a "loud banging" coming from the bathroom, so he went to investigate. He stated he "picked the lock" to the bathroom door, and he saw defendant "beating on an oversized pill" with a hammer. According to Perrow, when defendant exited the bathroom, he "was trying to pour everybody shots." Perrow stated he "threw [the shot] to the side" because he did not "know what was in it" due to what he had observed defendant doing in the bathroom. Perrow also testified M.G. did not want to drink the shot prepared by defendant, but defendant "kept trying to put pressure on her to take it, and she finally took it." Perrow reiterated he saw defendant crushing a pill with a hammer. However, he admitted he did not know what happened to the pill thereafter.

Tyler Stewart testified he was also present at Bryant's house on the night of July 30, 2021. He stated defendant and M.G. arrived at the house, and defendant instructed him to call him "Jay." Stewart also stated after defendant went into the bathroom, he heard a "beating" sound, and Perrow told him defendant was "beating on something." He also stated when defendant exited the bathroom, he "told us to take a shot." He testified he saw defendant give M.G. a shot, and he saw her drink it. Stewart further stated M.G. started "wiggling" soon after she consumed the drink, and defendant "leaned over to us and said he got her – he got her something."

9

Stewart testified after Perrow told him what he had witnessed defendant doing in the bathroom, he inferred defendant had laced M.G.'s drink.

Olivia Jones testified as an expert in forensic sexual assault examination. She stated she was called to Ochsner LSU-Shreveport to examine M.G. on July 31, 2021. Jones testified she collected vaginal swabs, cervical swabs, vaginal washings, external genitalia swabs, perineal swabs, and anal swabs from M.G. during the examination. She also drew blood and collected a urine sample for toxicology testing.[7] Jones further stated M.G.'s physical examination did not reveal any overt signs of injury, such as vaginal tears or abrasions, and she would not expect to observe vaginal tearing on adult females who are sexually active.

Kari Dicken, a forensic DNA analyst for the North Louisiana Crime Laboratory in Shreveport, testified as an expert in forensic DNA analysis. She testified she examined the forensic examination swabs taken from M.G. during the sexual assault examination, in addition to the reference sample obtained from defendant, and she was able to isolate sperm DNA taken from the swabs. She determined the DNA on the swabs belonged to M.G. and defendant.[8] Dicken also testified the semen was likely put into M.G.'s

---

[7] Corporal David Karam, a sex crimes detective, took possession of the PERK and all other evidence, including the panties M.G. was wearing the night of the incident. He transported the items to the sex crimes unit.

[8] Dicken testified the probability of another person with the same male DNA profile consistent with that taken from M.G.'s external genitalia swab would be approximately one in 3.18 quadrillion (one million billion); the probability of finding the same DNA as defendant's DNA obtained from M.G.'s perineal swab would be one in 11.5 quintillion (one billion billion); the probability of finding the same DNA as defendant's DNA obtained from M.G.'s vaginal swab would be one in 3.46 trillion (one thousand billion); the probability of finding the same DNA as defendant's DNA obtained from M.G.'s cervical swab would be one in 10.5 quadrillion (one million billion); and the probability of finding the same DNA as defendant's DNA obtained from M.G.'s vaginal washings swab would be one in 17.9 quadrillion (one million billion). Dicken was unable to interpret the DNA obtained from the anal swab.

vagina "from the assault or from the sexual activity." During cross-examination, Dicken admitted she did not know when defendant's DNA was placed in M.G., and she did not know whether defendant and M.G. engaged in consensual sexual intercourse.

Emily Raley, a forensic scientist in the toxicology section of the North Louisiana Crime Laboratory, testified as an expert in the field of forensic toxicology. Raley testified she analyzed the blood and urine samples obtained from M.G. She stated the blood testing detected the presence of Clonazolam, and the urine testing detected the presence of carboxy tetrahydrocannabinol, a metabolite of THC (the active component in marijuana). According to Raley, the Clonazolam, a Schedule I controlled dangerous substance, is known as a "designer benzodiazepine." She stated the drug has not been approved for medical use, is not used in hospitals or prescribed by physicians, is geared toward illicit black-market dealings, and is typically purchased online. Raley also testified Clonazolam suppresses the central nervous system and causes sleepiness, sedation, slurred speech, amnesia, respiratory depression, coma, and loss of consciousness. She stated it is unknown how much Clonazolam M.G. ingested. She further testified because Clonazolam is a street drug and not approved for use, little is known about its concentration or how long it remains in a person's system after use.

Corporal David Karam, of the SPD, testified he was employed as a sex crimes detective on July 31, 2021, and he was responsible for investigating sexual assault cases. He stated he took possession of the PERK, toxicology kit, and M.G.'s clothing; he transported the items to the

sex crimes bureau. Cpl. Karam also testified he requested a photographic lineup to present to M.G.[9] He further stated he interviewed defendant on December 8, 2021.[10] Cpl. Karam stated during the interview, defendant's account of the events of July 30-31, 2021, was the similar to the accounts provided by M.G. and other witnesses. Cpl. Karam also stated defendant admitted to sending the text message to Bryant, instructing Bryant to say he went to Party Central with a girl and engaged in sexual intercourse with the girl in defendant's truck. However, defendant denied having sexual intercourse with M.G., and he denied lacing M.G.'s drink with a drug. Cpl. Karam stated defendant was charged with second degree rape based upon the statements provided by witnesses and the results of the PERK and toxicology.

The record shows the State presented evidence to establish defendant was seen crushing a "large pill" with a hammer, and shortly thereafter, he poured M.G. a shot of Patrón. M.G. drank the shot and immediately began feeling unwell. M.G. does not remember much of what occurred after she took the shot of Patrón. Bryant testified M.G. was unable to walk without assistance by the time they left the biker club, and MG-2 testified M.G. was unconscious when defendant brought her home. Based on the evidence, the jury apparently inferred defendant placed the Clonazolam into M.G.'s drink and later took advantage of her apparent stupor by engaging in sexual intercourse with her without her consent, as she was prevented from

---

[9] Cpl. Karam testified every photographic lineup is sent to the Louisiana State Analytical Fusion Center, which compiles lineups containing a photograph of the suspect, as well as "filler photographs" of persons of similar race, sex, build, skin tone, and facial features.

[10] The relevant portions of the recorded interview was played for the jury.

resisting these acts by defendant's action of lacing M.G.'s drink with the drug. The jury considered the physical evidence, heard the testimony and weighed the credibility of the witnesses. In reaching its verdict, the jury reasonably found the testimony of M.G., Bryant, Perrow, Stewart, and MG-2 to be more credible than defendant's version of the events. Considering the evidence presented in a light most favorable to the State, we conclude the record supports the jury's determination the State proved defendant's guilt of second degree rape beyond a reasonable doubt.

Defendant also contends the sentence imposed, 35 years without the benefit of probation, parole, of suspension of sentence, is constitutionally excessive under the facts of this case. He argues as follows: the sentencing range for second degree rape is five to 40 years, and the 35-year sentence is a near-maximum sentence; the trial court failed to articulate any mitigating factors; the court failed to consider defendant did not have any prior sex-related offenses; and the court did not order a PSI and did not mention any factors, such as defendant's background, personal life, education, family, or other relevant factors.

We note defense counsel made an oral objection to the sentence at the hearing and filed a motion to reconsider sentence. However, neither included specific grounds. In the motion to reconsider sentence, defendant did not argue that the trial court failed to provide a factual basis to justify the 35-year sentence, and he did not argue the trial court failed to consider none of his prior criminal offenses were sex offenses.

Ordinarily, appellate review of sentences for excessiveness utilizes a two-step process. However, when the motion to reconsider sentence raised

only a claim of constitutional excessiveness, a defendant is relegated to review of the sentence on that ground alone. La. C. Cr. P. art. 881.1(E); *State v. Mims*, 619 So. 2d 1059 (La. 1993); *State v. Parfait*, 52,857 (La. App. 2 Cir. 8/14/19), 278 So. 2d 455, *writ denied*, 19-01659 (La. 12/10/19), 285 So. 3d 489; *State v. Williams*, 51,667 (La. App. 2 Cir. 9/27/17), 245 So. 3d 131.

A sentence violates La. Const. art. I, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. *State v. Dorthey*, 623 So. 2d 1276 (La. 1993); *State v. Lindsey*, 50,324 (La. App. 2 Cir. 2/24/16), 189 So. 3d 1104. A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. *Id.* The trial court has wide discretion in the imposition of sentences within the statutory limits, and such sentences should not be set aside as excessive in the absence of an abuse of discretion. *State v. Williams*, 03-3514 (La. 12/13/04), 893 So. 2d 7; *State v. Allen*, 49,642 (La. App. 2 Cir. 2/26/15), 162 So. 3d 519, *writ denied*, 15-0608 (La. 1/25/16), 184 So. 3d 1289.

The maximum and minimum sentences for second degree rape are set forth in La. R.S. 14:42.1(B). The sentencing range for second degree rape is five to 40 years at hard labor without benefit of probation, parole, or suspension of sentence.

In the instant case, the trial court did not order a PSI. Prior to imposing defendant's sentence, the court stated:

> So [the] Court also looks at the criminal history of the
> defendant as well as the number of pending charges. Defendant

14

has a history of criminal activity and that – that it shows a pattern of criminal – continuous criminal activities. The Court also having considered Article 893 – the provisions of Article 893 as well as the provisions of Article 894[.1], a lesser sentence would deprecate the seriousness of the offense; therefore, Court will sentence the defendant to 35 years hard labor without benefit of parole, probation or suspension of sentence to run concurrently with any other sentence he's required to serve. Credit is given for time served.

\*\*\*

The evidence established defendant, posing as "Jay" from California, invited M.G. out on a date. Defendant, armed with Clonazolam, crushed the pill, placed the drug in a shot of Patrón, and served the drink to M.G. After M.G. became so incapacitated that she was falling asleep and unable to walk without assistance, defendant engaged in sexual intercourse with her without her knowledge or consent. Defendant was fully aware M.G. was particularly vulnerable or incapable of resistance due to her incapacitated state. The sentencing judge stated he considered the facts of the case, as well as defendant's criminal history. The court noted it had considered the factors set forth in La. C. Cr. P. art. 894.1, and a lesser sentence would deprecate the seriousness of the offense. Based on this record, we find the sentence imposed is not grossly disproportionate to the severity of offense and does not shock the sense of justice. Consequently, we find the a 35-year sentence imposed is not constitutionally excessive.

## CONCLUSION

For the foregoing reasons, we affirm defendant's conviction and sentence.

**AFFIRMED.**

15